THE STATE EX REL. FRED W. FLEMING and FRANCES M. WILSON, Receivers of Kansas City Railways Company, v. EWING C. BLAND ET AL., Judges of Kansas City Court of Appeals.—15 S. W. (2d) 798.

Division One, March 29, 1929.

566

*Charles L. Carr, Watson, Gage & Ess, E. M. Tipton* and *E. E. Ball* for relators.

*Harry G. Kyle* and *Walter A. Raymond* for respondents.

RAGLAND, J.—Certiorari. In this proceeding relators seek to have quashed the opinion and judgment of the Kansas City Court of Appeals in the case of Celia I. Murphy, plaintiff, against Fred W. Fleming and Frances M. Wilson, Receivers of the Kansas City Railways Company, defendants, lately pending before that court on appeal from the Circuit Court of Jackson County, and wherein it affirmed the judgment of the circuit court in favor of the plaintiff.

The suit was for personal injuries received by plaintiff when struck by one of defendants' street cars. She had been a passenger on another of defendants'. cars; after alighting therefrom she walked around the rear end of the car and started across the street; she had proceeded but a few steps when she was struck by a car coming from the opposite direction on a parallel track. There was evidence tending to show that it was the custom and practice of passengers alighting from a car at the point where plaintiff got off to pass behind or in front of the standing car, and that it was the custom and practice of defendants to require their motormen operating a car, when passing a standing street car unloading passengers, to go very slow, not faster than three and a half or four miles an hour.

There was evidence on the part of the plaintiff that the car which struck her was 100 feet away when she came around the end of the car from which she had alighted and started across the track; that it was running at the rate of eight or ten miles an hour; that while running at that rate it could have been stopped within from fifteen to eighteen feet; and that, had it been running at the rate of three or four miles an hour, it could have been stopped within five or six feet.

The motorman testified that the car was going about three and a half or four miles an hour; that it was about twelve or fourteen feet from plaintiff when he first saw her start across the track; that he could have stopped the car running at three and a half or four miles an hour within a distance of twenty-five or thirty feet; and that as soon as he saw plaintiff starting across the track he threw the air in emergency and the car ran about fourteen feet after it struck plaintiff.

At plaintiff's instance the case went to the jury on negligence under the humanitarian doctrine only. As bearing on the issue of whether defendants' motorman, after discovering plaintiff's peril, could have stopped the car in time to have avoided injuring her, the circuit court at plaintiff's request gave the following instruction:

"The court instructs the jury that the practice of passengers alighting at rear exits of street cars and passing behind the street car to cross the tracks is of such frequent occurrence that it should be anticipated as likely to follow in every instance and the motorman operating a street car past a regular stopping place where another street car traveling in the opposite direction has stopped to discharge passengers should operate said street car at such a rate of speed as to permit an almost instantaneous stop on the appearance of a person coming from behind another street car."

The giving of the instruction was assigned as error in the Court of Appeals. In passing upon that assignment the court said:

"In view of the fact that the car was approaching a standing street car receiving and discharging passengers, the motorman had no right to expect a clear track. It was his duty to be on the lookout for persons who might come from behind the standing street car and go upon the track, and to operate his car at such a rate of speed that he could by the exercise of ordinary care, with the means at hand, and with safety to those on his car, stop said car or slacken the speed thereof, in time to avoid injuring persons who might come upon the track from behind said standing car, after he saw, or by the exercise of ordinary care could have seen, such persons on the track, in a position of peril, and oblivious to the near and dangerous approach of the car. If, in violation of that duty, he, as the evidence shows, ran his car from eight to ten miles per hour, and thus placed himself in a position where he could not avoid striking plaintiff after he discovered her perilous position, he is in the same situation as if he had discovered her peril in time, by the exercise of ordinary care, to have avoided striking her, but failed to do so. . . .

"It would serve no purpose for the motorman to keep a lookout for persons who might come upon the track, if he were operating his car at such a rate of speed that he could not, by the exercise of or-

dinary care, with the means at hand, avoid striking them, in event he discovered them in a position of peril on the track.

"The law under such circumstances is that although the motorman could not avoid the injury by the use of ordinary care after he saw or by the exercise of ordinary care could have seen the plaintiff in a position of peril on the track, the defendant is nevertheless liable if the motorman's inability to avoid the injury was caused by his negligence before the peril arose.

"The instruction under consideration told the jury that it was the motorman's duty to operate his car past the standing car, at such a rate of speed as to permit of an *almost instantaneous stop.*

"This instruction does not correctly define the duty of the motorman. It was not his duty, as a matter of law, to operate his car at such speed that he could stop it *almost instantly,* but to so operate it that he could by the exercise of ordinary care, in the manner heretofore stated, avoid injuring persons coming upon the track from behind the standing car."

The court held that the error in the instruction which it pointed out, in view of other instructions given, was harmless.

The holding of the Court of Appeals that defendants' prior negligence might, or should be, taken into consideration in determining whether they were guilty of negligence under the humanitarian doctrine contravenes many decisions of this court. A few of them will be noted.

Sullivan v. Railroad, 117 Mo. 214, was a case in which a large woman, while attempting to cross the railroad track in front of an approaching train, fell and was run over before she could extricate herself. An instruction submitting the case under the humanitarian doctrine concluded as follows:

"And in this regard the court further instructs you that although you believe from the evidence that Ellen Sullivan was guilty of negligence in stepping upon the track, and although you may believe from the evidence that the servants, agents and employees of defendant in charge of said train, after seeing her on the track, and discovering the danger of her position, if it was dangerous, could not have avoided injuring her by the use of ordinary care, yet if you further find and believe from the evidence that their inability to avoid such injury after discovering her condition, was caused by their running at an illegal rate of speed, and if they had then and there been running at a legal rate of speed they could have avoided injuring her, by the use of ordinary care, then such negligence of said Ellen Sullivan is no defense to this action."

In passing on the instruction this court, four of the judges concurring, said:

"Instruction number 5 given by the court for the plaintiff is unobjectionable down to the qualifying clause contained within brackets [the part just quoted]. With this clause omitted, the instruction is in harmony with instruction number 4 given for defendant, and with every ruling of this court upon the subject since the case of Harlan v. Railroad, 65 Mo. 22, in which, it may be said, the doctrine recognized and applied in earlier cases was first distinctly formulated, by which, a plaintiff was permitted to recover, notwithstanding the fact that his own negligence contributed to produce the injury of which he complains. This doctrine is so well understood in this State, and the cases are so numerous in which it has been reiterated, as to be unnecessary of citation or review. In the ruling of no one of them will be found support for the qualifying clause introduced into this instruction. After going through them all the only color of support for it, that we can find among our authorities, is a redundant remark of the learned judge made *arguendo* in Maher v. Railroad, 64 Mo. 276, and paraphrased in Dunkman v. Railroad, 95 Mo. 232. In both of these cases the remark was foreign to the ruling made, purely *obiter*, and in which at the same time the well-recognized rule on the subject was stated.

"The first time the doctrine contained in this qualifying clause came before this court in such a tangible shape as to warrant a ruling upon it, was in the case of Guenther v. Railroad, 95 Mo. 286, in which it was disapproved. The next was in Kellny v. Railroad, 101 Mo. 67, and the last in Dlauhi v. Railroad, 105 Mo. 645, in both of which it was also disapproved. The reasoning in these cases shows that to adopt it would be, in this class of cases, to practically abrogate the doctrine of contributory negligence. For while the principle which lay at the root of the accepted doctrine was that although the plaintiff was guilty of negligence contributing with that of the defendant to the production of the injury, yet if the defendant could by the exercise of due care, after the situation became or might have become apparent to him, have prevented the injury, he was held responsible. The principle of this new doctrine is that he is to be responsible whether he could have prevented the injury or not, after the situation became or might have become apparent to him."

The judgment was reversed because of the qualifying clause appended to the instruction.

Haley v. Railroad, 197 Mo. 15, involved, among others, a question of pleading: ordinance negligence and negligence under the humanitarian rule were charged in the same count. In passing on the question this court, speaking through Judge VALIANT, said:

"The petition charged that the defendant was negligent in the matter of speed and it also charged that the defendant negligently failed to stop the train in time to avoid the collision after the danger

was apparent. These two charges are not necessarily inconsistent, because they might both be true, that is, the train might have been moving at a rate of speed that under the circumstances was negligent and yet it might be that the engineer could have stopped it in time to have avoided the accident by the use of ordinary care. But the defendant would not be liable, under what we call the humanitarian doctrine, if the speed of the train was such as to render it impossible for the engineer by the exercise of ordinary care to have stopped it in time, although the speed may have been negligent. Therefore, whilst it is negligence to run a train into a place where danger of collision is to be expected at such a rate of speed that it could not be quickly stopped on appearance of danger, still it cannot be said that the defendant is liable for failing to stop the train after discovering the peril if in fact the speed was such that the engineer could not stop it.''

McGee v. Railroad, 214 Mo. 530, called for a determination of whether the facts in that case were sufficient to take to the jury the issue of negligence under the humanitarian rule. This court, Judge LAMM delivering the opinion, said:

''Nor, on this record, did plaintiffs make a case for the jury on the allegation in the petition invoking the humanitarian rule or the last-clear-chance doctrine, viz: that defendant's servants saw or by the exercise of due care might have seen Oscar McGee in peril in time to have thereafter saved his life by the exercise of such care. This is so because that doctrine seizes the actual facts as they exist. It proceeds, for instance, on the assumption in this case that Oscar was negligent in getting on the track without looking or listening, and that defendant's servants were negligent in not giving the crossing signals. It assumes the actual rate of speed the train had. Assuming all those thing, then, out of the law's tender regard for life and limb, the doctrine is evolved that defendant's servants owed the duty to have saved his life if they saw him, or might have seen him in peril at the crossing in time to have done so.''

Keele v. Railroad, 258 Mo. 62, also requiring a ruling on a demurrer to the evidence and called forth a somewhat elaborate discussion of the law of negligence. In the course of the opinion it was said:

''In this State, as everywhere, it has always been a general rule of law that, given the negligence of a defendant and an injury, then the concurrent contributory negligence of the injured party defeats the recovery. Such injury is the product of the joint fault of the two; both do it, and the law affords no remedy. It leaves the injured party to lie in the bed he helped make for himself.

''For reasons of humanity, however, there has been allowed an exception to that general rule, as well established as the rule itself. So that the law in this jurisdiction also is that when the negligence

of the injured party has put him in peril so distant from an on-coming car or locomotive that those operating it can by warning (or by stopping when possible and necessary) avoid injury to such person, after such operatives discover the peril (or, where a duty to look arises, might have discovered the peril) then liability for injury springs. On such hypothesis the act of negligence of the injured party is not deemed by the law so far forth concurrent as to defeat recovery, but the negligence of defendant is deemed the proximate cause of the injury, and hence, actionable. . . .

. . "The duty to use care to avoid injury on the hypothesis discussed in paragraph 2 [the humanitarian rule], arises only on discovery of peril or on negligence in discovering it when there is a duty to keep an outlook and make discovery of the peril. In either hypothesis it is essential to note that there must be *peril*, a danger zone."

Many cases decided by this court impliedly hold a situation of imminent peril is the basic fact of the humanitarian doctrine; that no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence; and that when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care in certain respects: to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others. [See Banks v. Morris & Co., 302 Mo. 254; State ex rel. Vulgamott v. Trimble, 300 Mo. 92.]

The ruling that the antecedent negligence of defendant may be taken into consideration in determining whether he was negligent under the humanitarian rule would in many cases permit an unwarranted recovery for primary negligence through the elimination, under the guise of that rule, of the defense of contributory negligence. The Kansas City Court of Appeals, has, however, so ruled in the following cases: Smith v. Railroad, 282 S. W. 62; Ruenzi v. Payne, 208 Mo. App. 113, 231 S. W. 294; Goben v. Railroad, 206 Mo. App. 5, 226 S. W. 631; Williams v. Railroad, 149 Mo. App. 489, 131 S. W. 115, and Murrell v. Railroad, 105 Mo. App. 88, 79 S. W. 505. Those cases to the extent of such ruling are disapproved.

Because of the conflict noted the opinion and judgment of the Court of Appeals in the case under review are quashed. All concur, except *Frank, J.*, not sitting.